**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

JERRICA BRIANNA PERRIGUEY,

Plaintiff,

2:26-cv-4124

-vs-

SHOW-ME CHRISTIAN YOUTH HOME,

and

SHOW-ME CHRISTIAN YOUTH HOME FACILITIES, INC.,

Defendants.

## COMPLAINT

Jerrica Brianna Perriguey ("Plaintiff") brings this action against Show-Me Christian Youth Home and Show-Me Christian Youth Home Facilities, Inc. ("Defendants") under 18 U.S.C. § 2255 and related statutes. Because the two entities share a single address, a single registered agent, and a common enterprise, Plaintiff does not yet know which is the proper defendant, or whether both share responsibility for the conduct described below. Plaintiff alleges as follows:

## PARTIES

1. Plaintiff Jerrica Brianna Perriguey is an adult survivor of childhood abuse, forced labor, sexualized humiliation, retaliation, and institutional exploitation at Show-Me Christian Youth Home. She was born on July 18, 1994. She was placed at Show-Me on or about August 4, 2008, when she was fourteen, and remained there until on or about May 12, 2012.

2. The Defendants are two Missouri nonprofit corporations, both in good standing, that operate from the same address under the same registered agent (Chad Puckett, 24302 Mahin Road, La Monte, Missouri 65337):

(a) Show-Me Christian Youth Home, with its principal office at 24302 Mahin Road, La Monte, Missouri 65337-3223; and

(b) Show-Me Christian Youth Home Facilities, Inc., with its principal office at the same address.

3. Together, Defendants owned, operated, controlled, managed, staffed, funded, or benefited from the residential program where Plaintiff was placed as a child. They held Show-Me out to parents, guardians, courts, churches, donors, and the public as a safe Christian home for children who needed care, structure, education, discipline, and spiritual guidance. And at all relevant times they exercised practical control over the ordinary details of Plaintiff's life — where she lived, when she slept, when she worked, what she ate, how she was disciplined, what hygiene she was allowed, what medication she received, what medical and mental-health care she could reach, how much contact she had with family and the world outside the program, and whether she would be believed or punished when she reported mistreatment.

## JURISDICTION AND VENUE

4. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 2255 and related federal statutes. Section 2255 gives a civil remedy to a person who, while a minor, was the victim of certain federal offenses — including forced labor under 18 U.S.C. § 1589 and certain federal sexual-abuse and exploitation offenses — and who suffered personal injury as a result. Plaintiff was a minor when Defendants and their agents subjected her to the conduct described in this Complaint.

5. This action is timely. When Congress eliminated the limitations period for § 2255 claims in 2022, Plaintiff's claim was not yet barred, because she had not reasonably discovered the full nature of the violations and injuries that form its basis — among them the institutional use of her confidential disclosures, the credibility-damaging statements placed in her records, and the connection between her medication, the institution's control of her, and its efforts to discredit or silence her.

6. In the alternative, any limitations period was tolled by Defendants' control of information, their concealment, their use of institutional records to impair Plaintiff's credibility, and the practical inability of a child in a closed residential setting to discover and act on federal claims against the institution that controlled her life.

7. Venue is proper here because the events giving rise to this action occurred in Missouri, and because Defendants owned, operated, controlled, managed, staffed, funded, or benefited from the facility where Plaintiff was placed, controlled,

exploited, and injured.

## FACTUAL ALLEGATIONS

8. Plaintiff came to Show-Me as a vulnerable child, not as a delinquent to be broken. She had spent much of her childhood navigating adult instability — a mother who struggled with addiction, a father in prison, informal custody arrangements, and a series of unsafe placements — and she had learned to survive through compliance, self-reliance, emotional control, and the care of others. The placement just before Show-Me made things worse: a married couple who held themselves out as therapists and Christian caretakers subjected her to verbal attacks, physical punishment, isolation, confinement in rooms and closets, and threats of psychiatric institutionalization. When she fled that home in the middle of the night and reported the abuse to the police, she was returned to the same custodial authority rather than protected.

9. Show-Me was presented to Plaintiff through a promotional video and other representations that emphasized faith, safety, family-style living, pastoral care, structure, and belonging — the very things she had rarely known and badly needed. She did not choose to go in any meaningful sense. She went because the adults with authority over her decided she would, and because the alternatives held out to her were homelessness, further instability, or institutional confinement.

10. From the moment she arrived, Defendants exercised near-total control over Plaintiff's life. Staff, house parents, and other adults acting for Show-Me governed her movement, her sleep, her food, her hygiene, her labor, her communication, her discipline, her contact with family, her ability to report to anyone outside, and her access to medical and mental-health care. This was not ordinary supervision. A child in that setting could not safely leave, refuse the demands placed on her, negotiate different conditions, call someone to come get her, or step away from the adults who ran the program; for her, resistance was not a choice but an invitation to punishment.

11. Defendants presented Show-Me as a Christian youth home. For Plaintiff it became something else — a place of control and fear, of deprivation and forced labor, of sexualized humiliation, punishment, medication, retaliation, and isolation.

12. The work Defendants required of Plaintiff went far beyond the chores of an ordinary family home. Under threat of punishment, she was made to perform labor that served the institution, including:

(a) being awakened in the middle of the night, sometimes around 2:00 a.m., to scrub entire houses — often houses that were already clean — for no purpose but exhaustion and submission;

(b) washing vehicles outdoors in winter without gloves, exposed to cold, wind, water, and chemical irritation, and refused permission to stop despite pain;

(c) moving woodpiles back and forth with no functional purpose;

(d) agricultural and grounds labor — collecting walnuts, handling hay bales, weed-eating large properties, clearing brush, and other field work unrelated to schooling or ordinary chores; and

(e) forced running in icy or unsafe conditions, assigned for trivial infractions, perceived disobedience, group punishment, or the arbitrary demands of adults.

(f) providing, at the age of fourteen and without any training, the intimate daily care of a severely disabled, nonverbal teenage resident with cerebral palsy — bathing and dressing her, changing her soiled diapers, changing her menstrual pads and clothing, and toileting her, including lifting her with the help of another girl while the resident was in hip and leg casts after surgery — care that Defendants assigned to the children in the home rather than to any professional nurse.

None of this was the ordinary contribution of a child to a household; it was compelled labor imposed on a minor under institutional control.

13. Defendants did not run Show-Me as a family home; they ran it as a revenue-generating enterprise. On information and belief, and as discovery will show, Show-Me earned revenue from sources that included tuition and program fees, payments for the placement and care of the children, state or custodial funds, solicited donations and contributions, and the agricultural and farm products produced on its property. The unpaid labor of Plaintiff and the other children furthered that enterprise. It maintained the homes, grounds, vehicles, and property, kept the farm and agricultural operations running, and spared Defendants the wages of the paid workers they would otherwise have had to employ. The labor was extracted for Defendants' financial benefit and the operation of their business, not as the ordinary contribution of a child to a household.

14. The harm Defendants used and threatened to compel Plaintiff's labor was serious harm within the meaning of 18 U.S.C. § 1589(c)(2), which reaches any harm — physical or nonphysical, including psychological harm — serious enough, under all the surrounding circumstances, to compel a reasonable person in Plaintiff's position to perform or continue performing labor in order to avoid it. The harms Defendants imposed and threatened included psychological harm and fear, near-total isolation from her family, sleep deprivation from middle-of-the-night and overnight labor, the loss of food, hygiene, and privileges, and the constant and coercive monitoring of her body and conduct. For a child confined in a closed residential institution, dependent on

Defendants for every necessity, and cut off from outside help, each of those harms was serious enough to compel her to perform the labor Defendants demanded.

15. Defendants tied that labor and discipline to the basic necessities of Plaintiff's life. Food restriction, sleep deprivation, the loss of hygiene privileges, isolation, and humiliation were used to compel compliance and to punish resistance, until the children at Show-Me understood that their food, their sleep, their cleanliness, their bodily comfort, and their hope of family contact all depended on obedience. Defendants benefited from the labor, which helped maintain the homes, grounds, vehicles, property, and farm operations and reduced the need for paid adult workers. Plaintiff was paid no fair wage for any of it, and she could not meaningfully refuse it: punishment followed resistance, and a child in a closed residential facility had no safe way to say no. She reasonably believed that refusing the labor or the discipline would bring serious consequences.

16. Defendants also subjected Plaintiff and other girls to sexualized discipline, exposure, and inspection that served no medical, safety, educational, or therapeutic purpose. Girls were made to strip down to towels and move through the common areas of the home as punishment, in the presence of — or within view of — adult male house parents and other adult men. Shower curtains were opened while girls were nude, and residents were watched as they bathed. After bathing, Plaintiff and other minors were subjected to inspections of intimate areas — "smell checks," including scrutiny of the crotch — to judge whether they were clean. Some of these inspections were carried out by older minors at the direction of adults or within the disciplinary system Defendants built and allowed; Defendants cannot escape responsibility by delegating the sexualized inspection of children to other children inside the institution they controlled.

17. Plaintiff and other residents were also made to sleep in common areas or under kitchen tables as punishment, in exposed and humiliating arrangements near adult living and sleeping areas. A male staff member or authority figure subjected Plaintiff to sexualized comments, flirtation, inappropriate touching, and butt-slapping. And when sexualized conduct surfaced, Defendants' response protected the institution rather than the children: they treated reports as problems of discipline and credibility, and they weaponized sexualized accusations, using claims of sexual misconduct between minors to justify punishment, psychiatric confinement, isolation, and intensified discipline.

18. In this setting, the sexualized humiliation and forced exposure did not stand apart from the forced labor and punishment; they reinforced the same system of control. Plaintiff learned that her body, her privacy, her hygiene, her credibility, her labor,

her food, her sleep, and her access to outside help all belonged to adults who could punish, expose, inspect, medicate, isolate, or disbelieve her.

19. Plaintiff reported mistreatment to adults with authority within the Show-Me system, and she disclosed mistreatment to a therapist used by or affiliated with Show-Me, identified to her as Marsha. She reasonably understood those communications to be confidential and protective. They were not. Her disclosures were instead revealed, used, or passed along in ways that served the institution and undermined her, and after she disclosed mistreatment, her institutional records came to include false and prejudicial statements that made her appear unreliable, unstable, dishonest, or less worthy of protection.

20. Defendants also used medication as part of their response to Plaintiff. She was given risperidone while under institutional control. Plaintiff does not contend that every medication decision was itself unlawful, but in this case the medication became part of the larger structure that controlled her body, her emotions, her speech, her credibility, and her ability to resist or report harm.

21. While she remained a child in Defendants' control, Plaintiff could not reasonably understand the relationship between the therapeutic betrayal, the institutional records, the medication, the attacks on her credibility, and the violations that form the basis of this action.

22. Defendants knew or should have known that Plaintiff and other children were being harmed. The forced labor, the punishments, and the deprivation were not hidden; they were part of the program's culture, carried out inside homes Defendants operated and controlled, alongside the hygiene restrictions, the sleep punishments, the collective discipline, the forced running, and the sexualized inspection and humiliation. Show-Me's leadership and supervisory staff were placed on notice of abusive practices more than once. Reports of sexual boundary violations were ignored, minimized, or treated as matters of discipline and credibility rather than child safety. Known risks were tolerated, and no meaningful corrective action followed.

23. Defendants benefited financially, operationally, and reputationally while Plaintiff and other children were exploited. Show-Me drew money, donations, funding, public goodwill, and institutional support from the residential program it promoted and ran, and it profited from the unpaid and underpaid labor of children, which maintained the property and spared the cost of paid adult workers.

24. Defendants' conduct caused Plaintiff lasting harm — trauma, fear, and humiliation; the loss of bodily privacy and of trust; emotional distress and damage to her sense of worth; instability in her relationships and her work; a deep distrust of authority; and the developmental consequences of being controlled, punished, exposed, disbelieved, medicated, and exploited as a child.

25. Some of these injuries were apparent at the time. Others came into focus only later, once Plaintiff had the distance, maturity, outside support, and access to information needed to understand what had been done to her.

26. What happened to Plaintiff was not one mistake, one misunderstanding, or one isolated lapse in judgment. It was a system — one that took a vulnerable child, controlled her, used her labor, stripped her of basic dignity, subjected her to sexualized humiliation and inspection, punished and discredited her for reporting, medicated her, isolated her, and left her to carry the harm into adulthood.

27. Separate from their direct conduct, Defendants are liable as beneficiaries under 18 U.S.C. § 1589(b). Defendants knowingly benefited, financially and by receiving things of value, from their participation in a venture — the operation of Show-Me — that obtained the labor and services of Plaintiff and other children by the coercive means described above. Defendants knew, or acted in reckless disregard of the fact, that the venture obtained that labor through force, coercion, serious harm, and a scheme that led the children to believe that refusal would bring serious harm. A violation of § 1589(b) is itself a violation of § 1589, and Plaintiff may recover for it under 18 U.S.C. § 2255.

28. Defendants are also vicariously liable for the conduct described in this Complaint. The staff, house parents, and other adults who controlled Plaintiff, compelled her labor, punished her, and subjected her to the treatment described above acted as Defendants' employees or agents and within the scope and course of that employment or agency. Defendants are responsible for their acts and omissions under the doctrine of *respondeat superior*.

## CLAIMS FOR RELIEF

### COUNT I
### CIVIL REMEDY FOR PERSONAL INJURY TO A MINOR
### 18 U.S.C. § 2255
### Predicate Violation: Forced Labor Under 18 U.S.C. § 1589

29. Plaintiff adopts the preceding paragraphs.

30. Plaintiff was a minor throughout the conduct described in this Complaint. Federal law forbids knowingly obtaining a person's labor or services by force or threats of force, by physical restraint or threats of physical restraint, by serious harm or threats of serious harm, by abuse of law or legal process, or by any scheme, plan, or pattern meant to make a person believe that refusing to work would result in serious harm. 18 U.S.C. § 1589.

31. Defendants obtained Plaintiff's labor and services while she was a minor, including the middle-of-the-night punitive cleaning, the winter vehicle washing without protection, the pointless moving of woodpiles, the agricultural and grounds work, the forced running, and other work that helped Show-Me operate. That labor went well beyond ordinary household chores.

32. Defendants obtained the labor through coercion — through punishment, deprivation, institutional control, religious pressure, humiliation, the loss of sleep and hygiene, food restriction, isolation, threats of consequence, and the simple inability of a child in a closed residential facility to refuse. Plaintiff reasonably believed that refusing the labor would bring serious consequences: punishment, humiliation, the loss of food, sleep, and hygiene, heavier discipline, isolation, forced exertion, damage to her credibility, and other harms that are serious to a child in institutional custody. That belief was reasonable, because punishment in fact followed resistance, and because the adults demanding the labor controlled every meaningful part of her life.

33. Defendants knew or should have known that Plaintiff's labor was being obtained through these coercive means, and they benefited from it financially and operationally, because the work of Plaintiff and other children reduced the need for paid adult labor and helped keep the institution running.

34. Plaintiff was therefore a victim of forced labor under 18 U.S.C. § 1589, and she suffered personal injury as a result. Under 18 U.S.C. § 2255, she is entitled to

recover the damages the law allows, together with the costs of this action and reasonable attorney's fees.

**COUNT II**
**CIVIL REMEDY FOR PERSONAL INJURY TO A MINOR**
**18 U.S.C. § 2255**
**Predicate Violation: Sexual Abuse, Exploitation, and Coercive Sexualized Conduct Under Federal Law**

35. Plaintiff adopts the preceding paragraphs.

36. Plaintiff was a minor throughout the sexualized humiliation, forced exposure, intimate inspection, boundary violations, coercion, and institutional retaliation described in this Complaint. Defendants and their agents used their custodial, religious, disciplinary, and institutional authority over Plaintiff to control her body, her privacy, her hygiene, her movement, her speech, and her credibility. The sexualized abuse and exploitation included forced towel-only exposure in common areas, nudity-related discipline, shower surveillance, visual inspection during bathing, post-shower intimate "smell checks" and crotch-area inspection, forced sleeping in exposed common areas, sexualized comments, inappropriate touching, butt-slapping, and the use of sexualized accusations as a tool of institutional control. It occurred in a custodial setting where Plaintiff could not realistically leave, refuse, seek outside help, or protect her own privacy and bodily dignity, and it served no legitimate medical, therapeutic, educational, disciplinary, or safety purpose.

37. Defendants knew or should have known that Plaintiff and other children were being subjected to sexualized humiliation, forced exposure, invasive inspection, and boundary violations. Plaintiff reported mistreatment to adults with authority within the Show-Me system, yet Defendants took no reasonable protective action after those reports and after notice of abusive practices. Instead, Plaintiff was disbelieved, punished, exposed, controlled, medicated, isolated, and made to appear less credible through the institution's records and response — while Defendants continued to benefit from the residential program in which she was controlled, exploited, silenced, and harmed.

38. Plaintiff suffered personal injury as a result of the sexualized abuse, exploitation, coercive institutional practices, indifference, and retaliation described in this Complaint. Under 18 U.S.C. § 2255, she is entitled to recover the damages the law

allows, together with the costs of this action and reasonable attorney's fees.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff Jerrica Brianna Perriguey asks the Court to enter judgment against Defendants, jointly and severally, for actual damages; liquidated or statutory damages where the law allows; punitive damages; reasonable attorney's fees; costs; pre-judgment and post-judgment interest; and all other relief the Court finds just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable under Federal Rule of Civil Procedure 38.

Respectfully submitted,

McGONAGLE JOHNSON, LLC
301 NE Mulberry Street–Suite 204
Lee's Summit, Missouri 64086
816-221-2222

By: ______________________________
Jarrett Johnson, Missouri Bar No. 42481
jj@mcgonaglejohnson.com
Attorney for Plaintiff Jerrica Brianna Perriguey